IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELIZABETH CLAS,                                )
                                               )
            Plaintiff,                         )
                                               )   No. 05 C 5976
      v.                                       )
                                               )   Judge Robert W. Gettleman
JO ANNE B. BARNHART, Commissioner of           )
Social Security Administration,                )
                                               )
            Defendant.                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Elizabeth Clas seeks judicial review of a final decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying plaintiff's supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1382, 1382a, and 1383. The court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Plaintiff has moved for summary judgment under Fed. R. Civ. P. 56, arguing that the decision of the Administrative Law Judge ("ALJ") affirming the denial of plaintiff's SSI benefits was not supported by substantial evidence in the administrative record. The Commissioner filed a cross-motion for summary judgment. After complete review of the administrative record, as well as the pleadings and the memoranda on file, plaintiff's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. The court reverses the denial of benefits, and remands the case to the Commissioner for further hearing.

# FACTS[1]

Plaintiff Elizabeth Clas is a thirty-seven year old woman who lives in Chicago, Illinois, with her three children. Defendant Jo Anne B. Barnhart is the Commissioner of the Social Security Administration. The following facts are those relevant to the pending motions only.

Plaintiff has a history of severe migraine headaches, lower back pain, and psychological problems characterized as depression, anxiety, and a borderline personality disorder. Her migraine headaches began when she was nineteen years old. Since 1999, plaintiff has taken various medications for her headaches, including Imitrex, Butalbital/ASA/Caffeine, Amitriptyline, Elavil, Diclofenac, and Fiorinal. According to plaintiff, while some of these medications have been effective at times in relieving her headache pain, "their side-effects leave her unable to function because of sleepiness and disorientation."

Beginning in 1999, plaintiff was treated for her headaches at the Neurology-Orthopedic Center at the University of Illinois, Chicago ("UIC"). On July 16, 1999, plaintiff was examined by Dr. Franco Campanella ("Dr. Campanella"). Dr. Campanella noted her history of migraines, which he described as involving photophobia, nausea, and lightheadedness, and noted that plaintiff's symptoms were improving.

By 2001, plaintiff's headaches had worsened and she returned to the UIC neurology clinic. On March 14, 2001, she was examined by Dr. Cathy Helgason ("Dr. Helgason"). Dr. Helgason noted that plaintiff reported "daily" headaches, sometimes two or three times a day, and that plaintiff was taking Imitrex, Ibuprofen, and BuSpar, but that these medications had limited effect. Plaintiff reported that Imitrex was the most effective in reducing pain, but that

---

[1]The following facts are taken from administrative record.

she needed to take 100 mg doses at the onset of the headache. Dr. Helgason prescribed a new medication, Amitriptyline, to be taken before bedtime. Plaintiff returned to Dr. Helgason on April 11, 2001, complaining of continuing chronic headaches and migraines. Dr. Helgason noted that some of plaintiff's medication were not effective, but that she was having success with Imitrex, at least to the extent that it prevented her headaches from becoming full-blown migraines. Dr. Helgason also noted that Elavil was helping plaintiff sleep, and increased the dosage of Elavil at bedtime. On August 7, 2001, plaintiff saw Dr. Helgason again. Dr. Helgason noted that plaintiff was having "some difficulty sleeping due to unknown causes." Dr. Helgason increased plaintiff's Elavil dosage. Dr. Helgason also referred plaintiff to Dr. Terry Nicola ("Dr. Nicola") for a rehabilitation evaluation.

Dr. Nicola examined plaintiff on August 22, 2001. Plaintiff reported frontal headaches "every day, 24 hours a day," but stated that Imitrex and the other medications she was taking helped. Dr. Nicola examined her cervical spine, and noted pressure and tenderized points. Dr. Nicola explained that the symptoms can relate to tension and stress, or to partial deconditioning and overall muscle imbalance. Dr. Nicola prescribed a course of physical therapy.

On September 15, 2001, plaintiff completed an "Activities of Daily Living Questionnaire" produced by the Bureau of Disability Determination Services. Plaintiff reported that she did most of the listed activities, including going out to eat, going to church, watching television, and talking on the phone, "some" of the time. One section of the questionnaire instructed plaintiff to "[d]escribe any changes in your ability to cook, shop, or perform household chores since your condition began." Plaintiff responded, "Sleep to [sic] much because

of medication." She also stated that she was not able to sleep well "because of medication and pressure."

Dr. Allan D. Nelson ("Dr. Nelson") performed a psychiatric consultative evaluation of plaintiff. Dr. Nelson's report is dated September 28, 2001. Plaintiff denied any significant emotional problems or symptoms, and stated that her only impairments are frequent headaches and neck pains. Relating her daily activities to Dr. Nelson, plaintiff stated that she gets up in the morning, gets dressed, eats breakfast, and helps her children get ready for school. She stays inside most days, usually going out only when necessary. During the day she performs household chores, watches TV, and reads the Bible. She said that she has regular contact with a number of friends and family members. She does her own shopping, cooking, and housework. Dr. Nelson felt that plaintiff was exhibiting marked denial, minimizing, and rationalizing of underlying emotional problems. Dr. Nelson suggests a borderline personality disorder.

On November 29, 2001, plaintiff completed the daily activities questionnaire again. She stated that she had trouble concentrating or thinking because she was taking too many medications. In response to the list of daily activities, plaintiff responded that she did most of activities "rarely/never." Going to church was the only activity that plaintiff reported doing regularly. Plaintiff stated that her medications relieved her pain "all day long" and that taking them "makes me want to sleep."

Dr. Mahmood Hadi ("Dr. Hadi") has treated plaintiff intermittently since her birth. Dr. Hadi last examined plaintiff on March 1, 2002, and completed a medical evaluation for the State of Illinois on approximately March 18, 2002. Dr. Hadi noted diagnoses of migraine headaches, rheumatoid arthritis of the cervical spine, and depression. He noted that the headaches had been

4

so severe that plaintiff had been hospitalized several times in the last year, and brain scans had been performed to rule out a tumor. Dr. Hadi indicated that plaintiff had no complaints at the time of his exam because the medications were relieving her headaches and she was receiving physical therapy for her pain. The only physical condition that Dr. Hadi noted during his examination was tenderness in plaintiff's neck.

At the hearing before the ALJ on October 9, 2002, plaintiff testified that her back and neck pain causes her headaches. She stated that back pain effects her "constantly every day," but that she takes medication before the pain progresses into a migraine. She stated that she takes medication two or three times a day to prevent migraines. Plaintiff testified that the medication makes her extremely drowsy, and she sleeps "all day," waking up to get her children ready for school in the morning and then going back to bed. She testified that she is usually too weak to remain up, and said, "Daily I stay up two to three hours and the rest of the day I'm sleeping because of medication I'm on." She also testified that drowsiness is a side effect of several of her medications. Under questioning by the ALJ, she stated, "I'm constantly on medication so I'm always tired. And if I don't take my medication I'm just going to be all day with a migraine nonstop." Plaintiff testified that Dr. Hadi, who prescribed Amitriptyline, knew that she was sleeping "through the day" due to the medications. Plaintiff also testified that she sees a chiropractor five times a week for her neck pain, and the chiropractor indicated that her slanted spinal cord is attacking her nerves, which causes migraine headaches.

Plaintiff has completed the tenth grade and has no past relevant work history except for two very brief jobs. In 1999, she worked for approximately two weeks as a telemarketer. Accordingly to plaintiff, she left because the pressure and stress of the job and her migraines

were "too much" for her to handle. From January 2000 to February 2000, she worked as an activity nurse in a nursing home, but was let go because the medications she took made her extremely drowsy and her employer said that she was "constantly falling asleep."

Plaintiff applied for SSI benefits on August 29, 2001, stating that she became disabled on February 28, 2001, due to nerves and migraine headaches. After her application was denied initially and on reconsideration, plaintiff requested a hearing before an ALJ. Plaintiff appeared at the hearing held on October 9, 2002, and was represented by counsel. On October 24, 2002, the ALJ ruled that plaintiff was not disabled at step five of the sequential analysis[2] because her residual functional capacity ("RFC") allowed her to perform a full range of medium work. The Appeals Council denied plaintiff's request for review on August 19, 2005, and adopted the decision of the ALJ as the final decision of the Commissioner. Plaintiff filed the instant complaint on October 18, 2005, seeking reversal of the denial of her claim for benefits, or in the alternative, remand to the SSA for further proceedings.

## **STANDARD**

The Commissioner's factual findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). "Although a mere scintilla of proof will not suffice to uphold the Commissioner's findings, the standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Diaz v. Chater, 55 F.3d 300, 305 (7th Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401

---

[2]Under 20 CFR § 416.920, a five-step evaluation must be performed to determine if a claimant is disabled. The fifth step states, "Even if the claimant's impairment or impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled."

(1971). This standard of review recognizes that the ALJ is entrusted to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. Richardson, 402 U.S. at 399-400. The reviewing court may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the agency to decide whether a claimant is or is not disabled. Diaz, 55 F.3d at 305; Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993).

If a court determines that the ALJ's decision is not supported by substantial evidence and should be reversed, a remand for further proceedings, not an award of benefits, is appropriate unless all factual issues have been resolved and the court can conclude, with some certainty, that the claimant is totally disabled. See Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993).

## **DISCUSSION**

Plaintiff challenges the ALJ's determination that plaintiff is not disabled because she can perform a full range of medium work activity. Plaintiff argues that the ALJ erroneously rejected plaintiff's credibility, failed to give deference to Dr. Hadi's medical opinions, and failed to consider the side effects of the medications that plaintiff was taking. Defendant argues that the ALJ's findings are supported by substantial evidence and should be affirmed.

The ALJ found two portions of plaintiff's testimony incredible: (1) her reports of excessive sleepiness; and (2) her complaints of frequent, protracted migraine headache pain. Generally, a credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility. Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). Where, however, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," a court cannot uphold the

ALJ's determination. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996); Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998).

In analyzing an ALJ's opinion for such fatal gaps or contradictions, a court should "give the opinion a commonsensical reading rather than nitpicking at it." Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999). If a credibility finding is based on an inarticulable or intangible factor, such as demeanor, and supported by some evidence, a court may set aside the finding only if it is patently wrong. Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994). If the credibility finding is not based on such a subjective factor, as in the instant case, a court has greater freedom to review the finding. Id. For the reasons discussed below, the ALJ's credibility determinations are not sufficiently articulated and supported by evidence in the administrative record.

The ALJ found plaintiff's testimony that she sleeps "all day" to be contrary to what she told Dr. Nelson in September 2001, when she complained of insomnia. The ALJ also noted that plaintiff complained of sleep deprivation during her clinical visits at UIC in 2001, and was given Elavil to help her sleep. The ALJ wrote, "Since there have been no significant changes in her medications since 2001, and nothing else in the record explains this phenomenon, I do not find those reports particularly credible." Plaintiff argues that the ALJ incorrectly assumes that insomnia and excessive daytime drowsiness are mutually exclusive, and that this represents an erroneous medical judgment by the ALJ about the nature of insomnia. See Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir. 1985) (ALJ cannot make his own medical judgments about the claimant). Plaintiff also argues that the ALJ failed to consider the side effects of her medications, which include drowsiness.

8

The medical literature defines insomnia as an inability to sleep "during the period when sleep should normally occur," varying in degree from "restlessness or disturbed slumber to a curtailment of the normal length of sleep or to absolute wakefulness." Stedman's Medical Dictionary (26th ed. 1995). Plaintiff asserts that it is therefore entirely consistent, if not expected, that someone who suffers from insomnia and thus has trouble sleeping at night will also suffer from excessive sleepiness during regular waking hours, particularly when combined with headaches and medications that may both cause drowsiness. The court agrees. Plaintiff's argument is supported by her testimony and her previous statements about her condition, which indicate that she suffers from insomnia at night and excessive drowsiness during the day. Plaintiff testified, "I don't sleep very well in the night because of my bones so the medication I do take drains me out and I sleep practically all day in the morning."

Plaintiff argues that the ALJ's error was compounded by his failure to consider the side effects of her medications. Social Security Ruling 96-7p ("SSR 96-7p"), which lays out seven factors to consider in making credibility determinations regarding an individual's self-reporting of medical symptoms, requires consideration of the "type, dosage, effectiveness, and side effects" of medication. In the instant case, plaintiff testified that the medications she took during the day to prevent and relieve headaches, combined with her lack of restful sleep at night, caused drowsiness. Plaintiff's responses to the daily activities questionnaires corroborate her description of difficulty sleeping at night as well as medication-induced drowsiness for the last several years. In the September 2001 questionnaire, she stated that she had difficulty sleeping because of medication and pressure, and that she slept too much because of her medications. In her November 2001 questionnaire, plaintiff stated that her medications "make me want to sleep."

9

The ALJ does not question plaintiff's testimony that the medication she takes "makes her extremely drowsy," but he fails to discuss this side effect in connection with her disability or to consider it in his credibility determination, as required by SSR 96-7p. For example, the ALJ notes that plaintiff's medications have not changed significantly since 2001, but fails to consider that she has been concurrently an insomniac and drowsy during the day since that time. In reaching his conclusion, the ALJ fails to appreciate that plaintiff's disability was caused by the combination of the condition and its treatment, and improperly discounts plaintiff's testimony that she suffered from insomnia and excessive drowsiness concurrently. See Patterson v. Barnhart, 2006 WL 1044806, at * 11 (E.D. Wis. Apr. 12, 2006) (reversing ALJ's adverse credibility finding in part because ALJ failed to discuss side effects of medications, when claimant testified the medications made him tired, drowsy and dizzy and complained of similar effects in his questionnaires).

The ALJ states that he is "skeptical" of plaintiff's complaints of frequent, protracted migraine headache pain because plaintiff told her doctors that the medications offered relief, but there are gaps in this reasoning as well. According to plaintiff's doctors reports from the end of 2001 and early 2002, plaintiff's headaches were controlled by medication. None of the doctors, however, question that she is still prone to severe headaches, has experienced them in the last several months, and needs to remain on medication to control them. For example, although Dr. Helgason noted on March 14, 2001, that Imitrex can prevent a migraine if taken "at onset," she added another pain medication, Fiorinal, to plaintiff's regime only a month later, on April 11, 2001. Dr. Hegalson noted in her August 7, 2001, report that plaintiff continued to experience migraine headaches. Similarly, although Dr. Hadi's March 11, 2002, report states that plaintiff

10

did not have current complaints of migraines because of her medications, he describes plaintiff as suffering from "severe headaches."

In addition, the ALJ fails to consider plaintiff's testimony that while the medication may be able to prevent her worst headaches, her ability to work remains limited due to her drowsiness. Under Social Security Ruling 96-8p, an RFC assessment should include consideration of "the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." Because the ALJ does not discuss the effect of her purported medication-induced drowsiness on her disability, it is unclear if he considered whether she remains unable to sustain full-time competitive work even when her headaches are lessened or prevented by medication. Steele v. Barnhart, 290 F.3d 936, 941-42 (7th Cir. 2002) (an ALJ must provide sufficient reasons for discounting an applicant's testimony so that "subsequent reviewers will have a fair sense of how the applicant's testimony [was] weighed").

The ALJ's second finding in support of his adverse credibility determination regarding the severity of plaintiff's headaches is similarly flawed. The ALJ states that plaintiff's daily activities and social functioning "belie" her claims of daily frequent headaches, and points to plaintiff's description to Dr. Nelson of her daily activities, including household chores and contact with friends and family members. Plaintiff also, however, told Dr. Nelson that she goes outside only when necessary, and that she has no hobbies, interests, or activities. The Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006), and has noted that an ALJ must

11

consider whether necessary activities are performed with difficulty, Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005).

In Gentle, the Seventh Circuit reversed the ALJ's finding that the claimant was not disabled because the ALJ overlooked evidence that the claimant performed household chores with difficulty and with the help of others, and casually equated household work with labor market work. Id. Analogously to Gentle, plaintiff testified that she performs household chores, but that her drowsiness and neck paint make them difficult. She stated that her children, who are eight, thirteen, and fifteen, help her "a lot" with household chores and that she often buys TV dinners so she does not have to do too much work. In addition, plaintiff's responses to the September 2001 and November 2001 daily activities questionnaires also state that her children help her with cooking and other household chores, and indicate that it is increasingly difficult for her to perform household chores and other social activities. In September 2001, plaintiff indicated that she performed the majority of listed activities only "some" of the time. By November 2001, she stated that she performed most of the same activities only "rarely/never." The ALJ failed to consider these questionnaires. Further, the majority of the chores listed by Dr. Nelson and relied on by the ALJ involve caring for her children. The Gentle court noted that a mother's need to care for her children "may impel her to heroic efforts" that may misrepresent the true nature of her disability. Gentle, 430 F.3d at 867.

Lastly, the ALJ questioned how plaintiff "can even attest to migraine headaches lasting 8 to 9 hours each, if she sleeps as much as she would have me believe." To begin with, plaintiff's testimony regarding headaches lasting eight to nine hours refers to a period of time two years prior to the hearing, prior to changes in her medications and beginning physical therapy. In

12

addition, the ALJ fails to clearly articulate the inconsistency between experiencing a severe, long-lasting headache and sleeping or being in bed "all day." In fact, plaintiff's testimony seems to indicate that she spent most of the day in bed but not necessarily asleep, or at least not continuously or soundly. See Mendez v. Barnhart, 439 F.3d at 363 ("When a person says that she sleeps all day, she doesn't mean it literally; she means that she is abnormally sleepy and listless and dozes off frequently."). The Mendez court also noted that there is no inconsistency between feeling drowsy all day and caring for one's children. Id.

In an attempt to shore up the ALJ's credibility determination regarding the ongoing severity of plaintiff's headaches, defendant's brief cites evidence not relied on by the ALJ and misstates the record. For example, defendant argues that there are no records supporting plaintiff's testimony that at the time of the hearing she was seeing her doctor once a month and her chiropractor five days per week. The ALJ noted this portion of plaintiff's testimony but did not mention lack of records for such frequent visits. Defendant therefore cannot raise it now. Steele, 290 F.3d at 941 (Commissioner cannot use "the record as a whole" to fill gaps in the ALJ's analysis). Similarly, defendant argues that plaintiff's doctors' reports do not mention daytime drowsiness, but because the ALJ did not rely on her failure to report the side effects defendant cannot support his adverse credibility finding.

Defendant also asserts that the record evidence "did not demonstrate that plaintiff required hospitalizations or emergency room treatment for her complaints of headaches." First, the ALJ did not refer to this evidence. Second, it is contradicted by the record. Plaintiff testified that she went to the emergency room at St. Anthony's six or seven times for migraines. Dr.

Hadi's March 11, 2002, report also states that plaintiff had been admitted to St. Anthony's "several times" for migraines.

The ALJ failed to develop a rational bridge between the entire record and his determination that plaintiff's testimony regarding daytime drowsiness and frequent headaches was not credible, and thus failed to articulate a reasoned basis for his credibility determination. See Barrett v. Barnhart, 355 F.3d 1065, 1069 (7th Cir. 2004) (collecting cases). Accordingly, the court grants plaintiff's motion for summary judgment and remands the case to the Social Security Administration for re-evaluation of plaintiff's credibility. See Taylor v. Barnhart, 425 F.3d 345, 355 (7th Cir. 2005) ("When an ALJ's decision is not supported by substantial evidence, we have held that a remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits.").

Because the court grants plaintiff's motion for summary judgment, it need not address plaintiff's additional argument that the ALJ erred by ignoring "the substance of the medical opinion of Dr. Hadi."

## CONCLUSION

For the reasons set forth above, the court grants plaintiff Elizabeth Clas's motion for summary judgment and denies defendant Barnhart's motion for summary judgment. The case is remanded to the Social Security Administration for further hearing consistent with this Memorandum Opinion and Order.

**ENTER:** May 30, 2006

_____
**Robert W. Gettleman**
**United States District Judge**